UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

    -v.-　　　　　　　　　　　　　　　　　　　　　　　　　　1:07-CR-0345
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　(LEK)
JOSEPH DURHAM,

　　　　　　　　　　　　　　Defendant.
_____

### **MEMORANDUM-DECISION AND ORDER**[1]

    Defendant Joseph Durham was indicted on August 2, 2007 on one count of unlawful possession of a firearm by a previously convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Indictment (Dkt. No. 1).  Defendant entered a plea of not guilty to the charge.  Def.'s Motion Mem. at 1 (Dkt. No. 8, Attach. 1).  Presently before the Court is Defendant's Motion to suppress statements made to law enforcement officers during two interrogations subsequent to his arrest on July 10, 2007, on the ground that the statements were taken in violation of his Fifth Amendment rights.  Motion to suppress (Dkt. No. 8).  The Court held a hearing on this Motion on February 20, 2008, which continued on March 19, 2008.  For the reasons discussed below, the Motion to suppress is denied.

### **I. BACKGROUND**

**A.  Arrest**

    On July 10, 2007, there were two outstanding arrest warrants for Defendant Joseph Durham, which had been issued for violations of New York State parole and federal supervised release

---

[1] For printed publication by the Federal Reporters.

conditions resulting from previous convictions.  Def.'s Motion Mem. at 2 (Dkt. No. 8); Gov's Response at 1 (Dkt. No. 9).  A joint surveillance operation of the United States Marshals, New York State Parole, Albany Police Department, and Albany County Sheriff's Office was put in place in the vicinity of 181 North Lake Avenue in Albany based on information from Defendant's parole officer, Al Dwyer, that Defendant was in that area.  Tr. at 5.

Defendant Durham was observed walking near 181 North Lake Avenue, and when officers wearing marked police vests approached, he fled on foot.  Id. at 6.  Law enforcement officials pursued Durham on foot, through the west side of the yard at 181 North Lake Avenue, down an alley between 183 and 185 North Lake Avenue, and was eventually apprehended near 205 North Lake Avenue.  Id. at 6-7.  During the foot chase, Parole Officer Dwyer made a radio transmission that he saw Defendant take a gun out of his waistband.  Id. at 8, 34.  Durham was unarmed at the time he was apprehended.  Id. at 7-8.  Defendant was taken into custody, transported to the Albany Police Department at 126 Arch Street, and placed in Interview Room 5.  Id. at 7-8; Gov. Exh. 2.  Once Defendant was captured, law enforcement conducted a search along the chase route and allegedly recovered a .32 caliber gun in a trash can in the alley near 181 North Lake Avenue.  Tr. at 8, 32.

**B. Suppression Hearing Testimony**

   **1. Detective Sbuttoni**

      **a. Testimony about Administering Miranda and Obtaining Waiver**

Over the course of the two-part suppression hearing, Detective Sbuttoni was questioned several times about the administration of Miranda rights and Defendant's alleged waiver.  The Government and Defendant disagree over whether Detective Sbuttoni's various statements in

2

response to questioning about these issues should be interpreted as consistent.  See Def.'s Mem. at 2-6 (Dkt. No. 21); Gov.'s Mem. 7-9, 17, 22 (Dkt. No. 24).  For the sake of transparency, the Court will present much of the relevant testimony verbatim and later explain how the Court reaches its conclusion that Defendant received and waived his Miranda rights.

Detective Sbuttoni testified that after the gun was recovered, he returned to the Albany Police Station and went into an interview room with Defendant and Officer Krikorian "to see if he would be willing to give a statement in regards to the weapon that was found." Tr. at 10.  Detective Sbuttoni stated that upon entering the interview room, he immediately went to the computer and "off of what is known as a defendant statement form, I read his Miranda rights." Id.  He testified that he did not print the form, although there was a functioning printer in the room, but read it from the computer screen. Id. at 11-12, 36-37; Gov. Exh. 1 ("Defendant Statement Form").  Through Detective Sbuttoni's testimony and evidence adduced at the hearing, it was established that a Department guideline is to read Miranda from a "Miranda Card" and obtain the defendant's signature or initials as evidence of the defendant's waiver of rights.  Def. Exhs. 4, 6; Tr. at 129-130.  Detective Sbuttoni testified that he did not follow those procedures, but rather administered Miranda using the Defendant Statement Form, the substance of which is essentially identical to the form provided in the Department guidelines. Id. at 134, 139.

On direct examination by the Government, questioning of Detective Sbuttoni proceeded as follows:

> Q:  I would ask you to go over for the Court what it is you read to Mr. Durham on that date."
> A:  All right. [sic]  Number one, that I have the right to remain silent.  Number two, that anything I say can and will be used against me in a court of law.  Number three, that I have a right to talk to a lawyer and have him with me while I'm being

3

> questioned. Number four, that if I cannot afford a lawyer, one will be appointed to represent me before any questioning, if I want one. And I just follow that up with, do you understand your rights?
> Q: You asked him that question after reading him his rights?
> A: That is correct.
> Q: Did he answer that question?
> A: Yes.
> Q: What answer did Mr. Durham provide?
> A: Yes.
> Q: He indicated he understood his rights?
> A: Yes.

Id. at 12-14. Detective Sbuttoni testified that during his questioning of Defendant, which began at 13:30 (1:30 p.m.) and lasted ten to fifteen minutes, Defendant never indicated that he wished to see an attorney, and he was "very personable." Id. at 14, 16. Detective Sbuttoni then left the interview room and Officer Krikorian continued to interview Defendant to gather general intelligence. Id. at 15-16, 63, 68, 71-73.

On cross-examination on February 20, Detective Sbuttoni was again asked about the administration of Miranda rights to Defendant. Although the Defendant Statement Form does not prompt a defendant to indicate understanding of each of the four numbered rights, Detective Sbuttoni stated that he asked Defendant if he understood each right individually as he read the form:

> Q: So when you read Mr. Durham his rights from the computer screen, you read him the rights enumerated one through four, correct?
> A: That is correct.
> Q: He didn't respond to you after each one of those rights, did he?
> A: He did.
> Q: So after you read number one, that you have a right to remain silent, did you ask him do you understand that?
> A: I did.
> Q: And he responded he did?
> A: Yes.
> . . . .
> Q: So your testimony today is that after each right you advised him of, he indicated

4

>   his understanding of it?
>   A: That is correct.

Id. at 39.

On redirect and recross-examination on February 20, Detective Sbuttoni was asked again about Defendant's response to hearing the Miranda warning:

>   By Mr. Sharpe:
>   Q: Did he indicate a willingness to speak with police?
>   A: He did.
>   . . . .
>
>   By Mr. Evangelista:
>   Q: Well, now you just testified he indicated a willingness to speak to you?
>   A: When I asked him his Miranda, if he understood his rights, yes.
>   Q: So he understood his rights?
>   A: He did.
>   Q: Okay. That's what you meant when you just indicated he expressed a willingness to speak to you?
>   A: No. Mr. Durham, again, I stated before, was very cooperative and cordial. He did not wish to discuss the fact that he was in possession of the gun. However, at one point I remember me sitting there laughing, he had talked about coming from some girl's house . . . . And we were laughing about it.

Id. at 56-57.

On March 19, Detective Sbuttoni was asked again about what he read to Defendant prior to attempting to interview him. Questioning by the Assistant United States Attorney elicited testimony from Detective Sbuttoni that he read the paragraph on the Defendant Statement Form that appears below the four enumerated rights:

>   Q: Now, again, this goes towards your prior testimony, and I believe that the transcript has been ordered, but Mr. Evangelista didn't ask you about the paragraph below number 4 on Defendant's 8 that's not given an enumerated number. Again, that's already admitted into evidence, but I'd ask you to read that and indicate as to whether or not you read that to Mr. Durham at the time of administering him his warnings? I believe you already testified to that previously, but –

5

> A: Correct.
> Q: Would you do that, please?
> A: After number 4 and the paragraph below 4, "I understand that these are my rights under law and I understand what they mean. Having these rights in mind, I wish to make the following statement. This statement is of my own free will and I have not been threatened or promised anything and I have not been offered any hope of reward or leniency."
> Q: Okay. And I believe this is part of your prior testimony, but I ask you, again, as we wrap this up, did you ask–after you read Mr. Durham the rights that you did, did you ask him if he understood those rights?
> A: I did.
> Q: Did Mr. Durham indicate to you that he was willing to speak to the police?
> A: Yes.

Id. at 143-144.

On recross-examination on March 19, Detective Sbuttoni was asked, once again, about his alleged administration of <u>Miranda</u> and procurement of a waiver from Defendant:

> Q:  So you asked him if he was willing to waive his rights, correct?
> A:  I asked him if he was willing to speak to me.
> Q:  And you asked him–and he said he was, right?
> A:  Correct.
> Q:  But you didn't take a statement from him, correct?
> A:  If you recall my prior testimony, I was not in–I was in that room for approximately ten minutes with him. He did not wish to speak with me, which is reflected in the arrest reports. The last arrest report, I walked out of the room. We started at 1343.
> . . . .
> Q:  So, now you're telling us you asked him if he was willing to waive his rights, correct?
> A:  He was read exactly what was on this form [Defendant's Exhibit 8] and responded to each one individually.
> . . . .
> Q:  I understand he was asked 1 through 4, that's your previous testimony.
> A:  And my previous testimony also included I read this last line to him.

Id. at 145-146.

### b. The Arrest Reports

Detective Sbuttoni testified that he signed arrest reports for each of the three charges

6

Defendant was arrested for: the state parole violation warrant (Def. Exh. 1), the state weapon possession charge based on the gun found after the foot chase (Def. Exh. 2), and the federal probation warrant (Def. Exh. 6). Tr. at 24-28. The latter arrest report was not produced at the February 20 hearing. Id. The arrest report form contains a box in which an officer can indicate "Yes" or "No" as to whether the defendant was administered Miranda. Def. Exhs. 1, 2, 6. The arrest report for the state weapons charge indicates that the Miranda warning was administered by Detective Sbuttoni at 13:30 (1:30 p.m.). Def. Exh. 2. The other two arrest reports indicate "No" in the Miranda box. Def. Exh. 1, 6.

On February 20, Detective Sbuttoni stated that he personally completed the report for the weapons possession charge only and the other report was filled in by an assisting officer, although he personally reviewed and signed both reports. Tr. at 20-21, 26-27. He testified that the state warrant arrest report was inaccurate to the extent that it indicated Miranda was not administered. Id. at 28. Detective Sbutonni also testified on February 20 that he prepared two other documents on July 10, 2007 regarding Defendant: an investigation report and a portion of a report he prepared for the U.S. Fugitive Task Force, which were offered into evidence. Id. at 51-52; Gov. Exhs. 4, 5. Each of these reports state, *inter alia*, the following: "At 1330 I administered Durham his Miranda Warnings from the computer generated Defendant Statement Form. Durham stated he understood his rights and agreed to be interviewed. During the course of the interview Durham made oral statements to P.O. Krikorian and Det. Sgt. Dewolf/Troy P.D. admitting to buying and possessing an 'old' .32 caliber gun . . . ." Gov. Exhs. 4, 5.

On March 19, Detective Sbuttoni produced the arrest report pertaining to the third charge for which Defendant was arrested, the federal probation warrant. Gov. Exh. 6; Tr. at 110. Also, for

7

each of the three arrest reports, he produced a document ("RMS document") generated by the computerized Records Management System that contains information not evident in the arrest reports. Tr. at 111; Gov. Exhs. 7-9. Annexed to each RMS document, the Government offered a copy of the corresponding arrest report that Detective Sbuttoni printed at the same time that he printed the RMS documents.[2] Tr. at 111-116; Gov. Exhs. 7-9. The RMS document for each arrest report is time-stamped, though Detective Sbuttoni did not know whether this "Entered" time-stamp reflected the time the report was started or completed. Tr. at 113, 124. From the respective RMS documents, it appears that the arrest report for the state parole warrant was entered at 12:56; the federal probation warrant at 13:13; and the state weapons warrant at 13:43. Gov. Exhs. 7-9. Detective Sbuttoni went on to testify that only the state weapons arrest report reflects that <u>Miranda</u> was provided because this is the only arrest report filled out after the interview, which began at 13:30, where he allegedly advised Defendant of his <u>Miranda</u> rights. Tr. at 113-117.

Furthermore, in contrast to his testimony on February 20, he testified on March 19 that he believed he personally completed all three arrest reports. <u>Id.</u> at 114, 120. Detective Sbuttoni stated that he reached this conclusion after testifying on February 20 when he reviewed the arrest reports and spoke with the officer who he previously testified had filled out at least one of the reports. <u>Id.</u> at 114-115. Detective Sbuttoni further testified that the reason he would have completed the arrest reports for the two warrant arrests but not the weapons charge prior to attempting to interview Defendant is that the weapons charge provided the only basis upon which he could attempt to

---

[2] Page 2 of Government Exhibit 7 is an unsigned copy of the state parole warrant arrest report offered as Defendant's Exhibit 1; Page 2 of Government Exhibit 8 is an unsigned copy of the federal probation warrant offered as Government Exhibit 6; Page 2 of Government Exhibit 9 is an unsigned copy of the state weapons charge offered as Defendant's Exhibit 2.

interview Defendant by obtaining a Miranda waiver, since the indelible right to counsel had attached for the warrant arrests. Id. at 118-119. For the same reason, Detective Sbuttoni testified that he would have filled those two arrest reports out the same way, indicating Miranda was not administered, even if he had completed them subsequent to the interview at 13:30. Id. at 121.

Detective Sbuttoni testified that he printed and signed each arrest report (Def. Exhs. 1, 2; Gov. Exh. 6) on the day of the arrest, and printed the unsigned copies of the arrest reports, which were offered into evidence annexed to the RMS documents, subsequent to the February 20 hearing. Tr. at 127. On cross-examination, questioning proceeded as follows:

> Q: And would that report have been changed from the day you signed it to today?
> A: No, absolutely not.
> Q: So that's–so my question is if someone changed that report, you would know it?
> A: It should reflect in the management system, it would say it, that's correct.

Id. Subsequent cross-examination demonstrated that for the state weapons arrest report, boxes pertaining to Defendant's place of birth and citizenship were changed after Detective Sbuttoni printed and signed the report. Id. at 127-128; Def. Exh. 2; Gov. Exh. 9. The Miranda box on both versions of the report indicates "Yes," indicating this notation was unchanged after Detective Sbuttoni signed it.

### 2. Officer Krikorian

Albany Police Officer Greg Krikorian testified that he witnessed Detective Sbuttoni administer Miranda rights to Defendant and Defendant orally waiving his Miranda rights. Tr. at 61, 76-77. After the gun was recovered, Defendant was questioned for "at least a couple of hours." Id. at 63-65, 71. Officer Krikorian stated that in the course of this interrogation about local criminal activity, they returned to the topic of guns and he asked a question that elicited from Defendant the

first set of statements that Defendant seeks to suppress. Id. at 65-67, 79. These statements were made at 1415 (2:15 p.m.). Id. at 68; Gov. Exh. 2. Some of these incriminating statements were recorded by Officer Krikorian in an Oral Statement Report and Officer Krikorian testified at the suppression hearing to additional, related statements allegedly made by Defendant. Gov. Exh. 2; Tr. at 81-83. Officer Krikorian continued to question Defendant, and a few hours after the first set of incriminating statements, Defendant provided information concerning guns in Troy, leading Officer Krikorian to call Detective DeWolf and another officer at the Troy Police Department to Albany to question Defendant. Tr. at 71-73. Officer Krikorian was not present in the interview room when the Troy officers questioned Defendant. According to Officer Krikorian, before the Troy officers went into the interview room, Officer DeWolf asked him if Defendant had been given Miranda or if he should administer the warning himself, and Officer Krikorian told him that he had already been given Miranda. Id. at 73.

### 3. Detective DeWolf

Detective DeWolf of the Troy Police Department testified that Officer Krikorian told him and the Troy sergeant accompanying him that Defendant had already been administered Miranda, and he did not give Defendant Miranda prior to questioning him. Id. at 89-90, 95. Detective DeWolf testified that Defendant did not at any time indicate that he did not want to speak to them or that he wanted to speak with a lawyer. Id. at 90. About twenty minutes into the conversation, at around 5:15 p.m., Defendant made a second set of incriminating statements regarding his possession of a gun during the foot chase and the purchase of that gun. Id. at 91-94; Gov. Exh. 3.

## II.  DISCUSSION

Defendant moves for suppression of statements he made during two interviews with law enforcement officials on July 10, 2007 on the grounds that his Fifth Amendment rights were violated.  See Motion to suppress (Dkt. No. 8).  It is undisputed that Defendant was in custody on July 10, 2007 when he made these statements.  See Gov.'s Br. at 1 (Dkt. No. 24).  It is obvious that the statements were made during police interrogation, since Officer Krikorian and Detective DeWolf testified that the statements were made in the course of questioning related to the gun charge.  Gov. Exhs. 2-3; Tr. at 14-15, 32, 77-78, 142.  Therefore, the Court must determine (1) whether Defendant was fully advised of the Miranda warning, and if so, (2) whether Defendant knowingly and voluntarily waived his rights under Miranda prior to extraction of the statements at issue in the present Motion.  See Def.'s Br. at 2 (Dkt. No. 21); Gov.'s Br. at 1 (Dkt. No. 24).  When a defendant seeks to suppress a statement based on a violation of Miranda, the government must prove by a preponderance of the evidence that Miranda was administered and that a valid waiver was obtained.  Colorado v. Connelly, 479 U.S. 157, 168 (1986).

**A.  Factual Dispute About Administration of Miranda Warning and Waiver**

Under Miranda v. Arizona, 384 U.S. 436, 444 (1966), "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  In the context of custodial interrogation, "unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence."  Oregon v. Elstad, 470 U.S. 298, 307 (1985).  The Court faces a factual dispute over whether Miranda was administered to Defendant before the interrogations.  At the suppression hearing, Detective

11

Sbuttoni and Officer Krikorian testified that Detective Sbuttoni administered <u>Miranda</u> warnings to Defendant.  Defendant did not testify, relying on his affidavit stating that he was not given <u>Miranda</u> rights.  <u>See</u> Durham Aff. (Dkt. No. 8, Attach. 2).  Inevitably, this sort of inquiry raises questions of credibility.  "Assessments of credibility of witnesses are the province of the district court."  <u>U.S. v. Gaines</u>, 295 F.3d 293, 298 (2d Cir. 2002) (quoting <u>United States v. Rosa</u>, 11 F.3d 315, 329 (2d Cir. 1993)).  <u>See also</u> <u>U.S. v. Diallo</u>, 206 F.App'x 65, 66 (2d Cir. 2006) (summary order).

     The Court must address two issues that are not determinative in this case, but detract from the Government's position in the Court's weighing of the evidence.  First, Detective Sbuttoni's testimony demonstrated he did not comply with Department standard operating procedure in administering and obtaining a waiver of <u>Miranda</u> rights, to the extent that he used the Defendant Statement Form rather than the Miranda Rights and Waiver Form, and failed to secure written evidence of a waiver.  <u>See</u> *supra*.  The substance of the Defendant Statement Form and the Miranda Rights and Waiver Form are essentially identical, and, if properly administered, equally sufficient for purposes of satisfying constitutional standards.  <u>See</u> <u>Miranda</u>, 384 U.S. at 467-473.  While the lack of adherence to the standard operating procedure is one factor the Court considers in assessing Detective Sbuttoni's testimony and the circumstances surrounding the interrogations, it is the standards set by the Supreme Court that the Court must use to measure whether Defendant was fully availed of his Fifth Amendment rights.  <u>U.S. v. Anderson</u>, 929 F.2d 96, 98 (2d Cir. 1991) ("We review the warnings not for whether they adhered to a certain form, but for their substance.").  <u>See, e.g.</u>, <u>U.S. v. Johnson</u>, 289 F. Supp. 2d 151, 155 (D.Conn. 2003).

     Second, the Court must closely examine the three arrest reports and related testimony, introduced as evidence about whether Defendant was given <u>Miranda</u> warnings.  First, cross-

examination of Detective Sbuttoni on March 19 revealed that the recent, unsigned copy of the arrest report for the state weapons charge differed in minor ways from the signed version. For purposes of the present Motion, this information is relevant to the extent that it bears on the Miranda inquiry. Both versions of the arrest report indicate "Yes" in the Miranda box. Therefore, the changes do not provide independent reason to question whether Defendant was properly administered Miranda. The Court does, however, consider this evidence of the discrepancies relevant to assessing Detective Sbuttoni's testimony, since his statements about this issue revealed that he was inadvertently erroneous in his testimony that the report would not be changed after he initially printed and signed it.

Arrest reports are useful in the context of a suppression motion to the extent that they serve to corroborate or contradict testimony about the administration or waiver of Miranda rights. For purposes of this hearing, the Government sought to use the arrest reports to corroborate testimony that Miranda was administered, but the Government was confronted with the fact that two of the three arrest reports indicate Miranda was not administered. As a result, a rational explanation for this discrepancy is required as part of the Government's burden of persuading the Court to deny the present Motion. As described *supra*, Detective Sbuttoni's explanation for the Miranda notations on the arrest reports[3] changed significantly between the February 20 and March 19 hearings. Due to the fact that nearly a year elapsed between making the arrest reports and the suppression hearing, it is not surprising that a detective would be unclear about the details concerning the completion of a

---

[3] Two arrest reports indicate Miranda was not administered, but the arrest warrant for the federal probation violation was not produced until the March 19 hearing. Therefore, at the February 20 hearing, Detective Sbuttoni was testifying only about the state warrant arrest report indicating Defendant had not been provided Miranda and the state weapons arrest report, indicating Miranda was provided.

particular set of arrest reports.  The Court finds no reason to believe any other reason motivated the change in testimony.  The Court is mindful, however, that the Government's burden is to persuade the Court of a larger issue, that Miranda was administered and waived, not the issue of why Detective Sbuttoni filled out the arrest reports as he did.  On February 20 and March 19, Detective Sbuttoni consistently testified that he was cognizant, prior to interrogating Defendant, that the indelible right to counsel had attached for the warrant arrests, and therefore Miranda was relevant only for the non-warrant arrest.  This is a reasonable explanation of why only the non-warrant arrest indicates Miranda was administered.  Detective Sbuttoni's change in other testimony about the arrest reports certainly bears on the weight to be afforded this portion of the explanation, and would require suppression of the statements if Detective Sbuttoni's testimony was not corroborated by Officer Krikorian.  In the context of Officer Krikorian's testimony, the Court does not believe that the questions raised about the arrest reports are sufficient to defeat the evidence signifying that Miranda was administered and knowingly and intelligently waived.

     Also, the parties disagree over whether Detective Sbuttoni was consistent in his testimony about the words he used to provide the Miranda warnings and how he procured a waiver of those rights.  The Court has closely scrutinized the hearing transcript.  Detective Sbuttoni answered slightly different questions, some of which were a bit ambiguous.  The phrasing of certain questions may have evoked more detailed responses than other questions, rather than inconsistencies.  In all of his testimony, Detective Sbuttoni clearly maintains that he read the warnings to Defendant that the Miranda court found necessary and sufficient to safeguard the privilege against self-incrimination.  See Miranda, 384 U.S. at 476-477.  Again, if the Court was forced to rely solely on Detective Sbuttoni's testimony to determine the present Motion, the Court would suppress the statements.

While Detective Sbuttoni's testimony, taken alone, did not convince the Court that Defendant's statements should be admitted, Officer Krikorian's testimony corroborated the crucial aspects of Detective Sbuttoni's testimony, namely that Defendant was administered Miranda rights and orally waived the rights. Officer Krikorian testified that he witnessed Detective Sbuttoni administer Miranda rights to Defendant and Defendant orally waiving his Miranda rights. Tr. at 61, 76-77. The Court finds Officer Krikorian's testimony highly credible and consistent. Furthermore, Officer Krikorian's testimony was corroborated by Detective DeWolf.

There was significant questioning related to the exact statements Detective Sbuttoni made to procure a waiver of Miranda rights. However, "Miranda does not require the interrogator to ask the suspect whether the latter understood each of the rights, although it is doubtless good police practice to do this when the circumstances permit." United States v. Hall 724 F.2d 1055, 1059 (2d Cir. 1983) (quoted in U.S. v. Johnson, 289 F.Supp.2d 151, 159 (D.Conn. 2003)). Detective Sbuttoni consistently testified that he asked Defendant questions deemed sufficient by Miranda to secure a subsequent waiver of his Fifth Amendment privilege. Officer Krikorian corroborated this testimony. Therefore, the Court is convinced that Defendant was administered the Miranda warnings and orally indicated that he waived the Miranda rights prior to the interrogations that elicited the incriminating statements. The issue that remains is whether the waiver is sufficient for purposes of the Fifth Amendment.

**B. Knowing, Voluntary and Intelligent Waiver**

After a defendant is advised of the Miranda warning, "[t]he defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444. Having determined that Defendant orally answered that he understood

and wished to waive his Miranda rights, the Court must "make a case-by-case determination based upon the totality of the circumstances" as to whether the waiver was constitutionally sufficient. Gaines, 295 F.3d at 297-298 (citations omitted). In making this determination, the factors considered by a court include the "background, experience, and conduct of the accused." North Carolina v. Butler, 441 U.S. 369, 374-375 (1979) (quotation marks and citation omitted).

"An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." Butler, 441 U.S. at 373. In the present Motion, Defendant raised a factual dispute: whether Miranda was administered and whether Defendant made a statement indicating a waiver of his rights. In his affidavit, Defendant makes the general claims he was not asked to, and did not, waive his Miranda rights. See Durham Aff. (Dkt. No. 8, Attach. 2). Defendant does not allege a specific circumstances that negates the validity of an oral waiver. Given that the Court has found that Defendant did orally state that he waived his Miranda rights, the Court is not required to examine whether the Government has proved the absence of every factual circumstance that could potentially negate a valid waiver.

Defendant asks the Court to infer that Defendant did not waive his Miranda rights from Detective Sbuttoni's testimony that he left the room because he concluded that Defendant did not want to provide useful information about the gun. A defendant's selective responses to questions does not necessarily negate a waiver of Miranda. Bui v. DiPaolo, 170 F.3d 232, 240 (1st Cir. 1999). According to Officer Krikorian's testimony, Defendant proceeded to engage in a wide-ranging discussion with Officer Krikorian, and eventually Defendant volunteered incriminating information relevant to the gun charge. Defendant does not allege that he asked for an attorney or indicated he

16

wanted to cease the conversation at any time.

The Court is convinced that the Defendant's waiver of <u>Miranda</u> rights was knowing, voluntary, and intelligent as required by <u>Miranda</u>. Accordingly, the statements were not taken in violation of Defendant's Fifth Amendment rights and the Motion to suppress is denied.

### III. CONCLUSION

Based on the foregoing discussion, it is hereby

**ORDERED**, that Defendant's Motion to suppress (Dkt. No. 8) is **DENIED**; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED**.

DATED:     May 30, 2008
           Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge